UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.:  20-168 (WMW/ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **POSITION OF THE UNITED** |
| | ) | **STATES WITH RESPECT TO** |
| v. | ) | **SENTENCING** |
| | ) | |
| MONTEZ TERRIEL LEE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, W. Anders Folk, Acting

United States Attorney for the District of Minnesota, and Thomas Calhoun-Lopez,

Assistant United States Attorney, hereby submits this memorandum setting forth its

position with respect to sentencing factors in this matter.

For the reasons delineated below, the United States asks this Court to sentence

Defendant Montez Terriel Lee, Jr. to a term of imprisonment of 144 months.

## I.     BACKGROUND

a.     *Offense Conduct*.

As the Court is well aware, on May 26, 2020, thousands of people gathered in the

area of 38th and Chicago Avenue to protest the death of George Floyd at the hands of

Minneapolis police officers.  Following the mostly peaceful protests that occurred on that

night, the Cities of Minneapolis and St. Paul, and some surrounding communities, endured

three nights of violence and destruction.  Between Wednesday night and the early hours of

Saturday morning, following several organized and peaceful protests, hundreds of

individuals carrying on into the night vandalized and looted local businesses and destroyed

1

buildings, vehicles, and other property through arson, smashing doors and windows, hurling objects, and other means.

As part of that unrest, on May 28, Mr. Lee and others broke into the Max It Pawn Shop located at 2726 East Lake Street.  Mr. Lee poured fire accelerant around the pawn shop and lit it on fire.  The subsequent fire destroyed the business.

On June 8, 2020, ATF Special Agent Certified Fire Investigators received three videos from the arson of the Max It Pawn.

The first video begins with people looting the Max It Pawn.  Then a masked man, later identified as Mr. Lee, is shown pouring liquid out from a metal container throughout the pawn store.  The video then cuts to outside the pawn shop, which is now on fire.  Mr. Lee is shown, now not wearing a shirt, holding his fist up.  The man taking the video exclaims "Oh, shit—you really did it!"

The second video begins with the man identified as Mr. Le  standing in front of the pawn shop as it is in flames  The individual filming asks Mr. Lee "What you do, Tez?" Mr. Lee responds "Fuck this place.  We're gonna burn this bitch down."

The third video begins with a group of men, including the man identified as Mr. Lee, joking about restaurants they are going to "hit" next.  It then cuts to a recording of a cell phone showing the looting of the pawn shop.



Fig. 1: A still from the first video, showing Mr. Lee pouring accelerant around the pawn shop.



Fig. 2: Mr. Lee in front of the burning pawn shop.

On June 5, 2020, a man named Oscar Lee Stewart, 30, was reported missing to the Burnsville Police Department by his mother.  Mr. Stewart's mother reported that she had not seen her son since May 28, 2020.  Investigators learned that Mr. Stewart's vehicle had been found near the Max It Pawn.

On July 20, 2020, authorities located Mr. Stewart's body in the rubble of the Max It Pawn.  Mr. Stewart's remains were submitted to the Hennepin County Medical

Examiner's Office.  That office attributed Mr. Stewart's death to "probable inhalation of products of combustion and thermal injury (building fire)."

      b.     *The Presentence Investigation Report*.

      1.     <u>The Government's Position</u>.

The United States agrees with the conclusions set forth in the Presentence Report ("PSR") concerning the Guidelines calculations.  Because a death resulted from the offense, the provisions of U.S.S.G. § 2A1.2 apply.  (PSR ¶ 16, citing U.S.S.G. § 2K1.4(c)(1).)  The adjusted offense level is therefore 38.  (PSR ¶ 16, citing U.S.S.G. § 2A1.2(a).)  With full credit for acceptance of responsibility, the total offense level is 35.  (PSR ¶ 25.)  Mr. Lee's prior convictions of burglary, assault, violation of no contact order, and theft of property yield five criminal history points.  (PSR ¶¶ 30, 33, 34, 35.)  Because Mr. Lee was under a criminal justice sentence for his prior assault conviction in Olmsted County, two additional points are added.  (PSR ¶ 39.)  Mr. Lee's criminal history category is therefore IV.  (PSR ¶ 40.)  The resulting Guideline range would be 235–293 month's imprisonment.  (PSR ¶ 78.)  Because this exceeds the statutory maximum term of 240 months, the Guideline range is 235–240 months' imprisonment.  (*Id.*, citing U.S.S.G. § 5G1.1(c)(1).)

      2.     <u>Mr. Lee's Objections</u>.

Consistent with his plea agreement, Mr. Lee has objected to the determination by the PSR that Mr. Stewart's death resulted from his offense, and the subsequent application of application of U.S.S.G. § 2A1.2(a).  (PSR A.1–A.2.)  The United States opposes this objection.  The United States has sought an evidentiary hearing to establish the relevant

4

facts at sentencing.  (Document No. 66.)

## II.    ARGUMENT

As the Court knows, in addition to determining Mr. Lee's Sentencing Guideline range (18 U.S.C. § 3553(a)(4)), the Court is required to assess the other applicable sentencing factors under Section 3553(a) of federal sentencing law.  Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

Pursuant to these factors, the United States requests the Court sentence Mr. Lee to a term of imprisonment of 144 months.

a.      *The Nature and Circumstances of the Offense*.

Mr. Lee committed a crime that cost a man his life.  His assertion that he did not intend to hurt anyone is of little comfort to the family and friends Mr. Stewart left behind. Their loved one has been cruelly taken away from them.  Mr. Stewart's life has been cut short.

It is for precisely this reason, of course, that the applicable Guideline provision for arson cross-references the homicide provisions, including the guidance regarding "felony murder."  U.S.S.G. §§ 2K1.3(c)(1)(B), 2A1.1, comment. (n.2(B)).  Arson in particular is an inherently dangerous and unpredictable felony offense.  The arsonist who sets a building

ablaze cannot know the extent of the damage or death he or she will cause—the crime is by its nature chaotic and uncontrollable. Surrounding homes and businesses may be inadvertently destroyed; firefighters, people trapped in buildings, or the arsonist him or herself may be killed. In this case, Mr. Stewart paid the cost for Mr. Lee's flagrantly dangerous disregard for others. Mr. Lee states that he checked the building before he set the fire to make sure no one would be hurt. (PSR ¶ 13.) If true, this is at least some small measure of precaution. But as the evidence makes clear, it was woefully inadequate. Mr. Lee's check of the building did not save Oscar Stewart's life; nor would it have been effective in saving the lives of any firefighters had they become trapped; nor would it have saved the lives and property of nearby neighbors if the wind carried the conflagration to their homes.

A significant sentence is necessary in this case. It is necessary to provide just punishment for a crime that cost Mr. Stewart his life; that deprived Mr. Stewart's family of their loved one; that risked the lives, homes, and businesses of Minnesotans. The question before the Court is what this sentence should be.

b.      *Applicability of the U.S. Sentencing Guidelines.*

The value of human life is, of course, incalculable. Civil law attempts to monetize it for purposes of remedy. Criminal law attempts to account for it for purposes of punishment. But for Mr. Stewart's family and friends, his life was invaluable. No price tag can be put on it, and no amount of punishment can equal the loss.

The Sentencing Guidelines note that for cases of felony murder where "the defendant did not cause the death intentionally or knowingly, a downward departure may

be warranted." U.S.S.G. § 2A1.1, comment. (n.2(B)). The Guidelines add that the "extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct." *Id.* The Guidelines note, however, that "departure below the minimum guideline sentence provided for second degree murder in § 2A1.2 (Second Degree Murder) is not likely to be appropriate. *Id.* Thus, the PSR's assignment of base offense level 38. (PSR ¶ 16.)

The Guidelines state that departure below this range is not *ordinarily* appropriate. However this is an extraordinary case. The United States therefore seeks a downward variance, and a sentence of 144 months.

Mr. Lee's motive for setting the fire is a foremost issue. Mr. Lee credibly states that he was in the streets to protest unlawful police violence against black men, and there is no basis to disbelieve this statement. Mr. Lee, appropriately, acknowledges that he "could have demonstrated in a different way," but that he was "caught up in the fury of the mob after living as a black man watching his peers suffer at the hands of police." (PSR ¶ 13.) As anyone watching the news world-wide knows, many other people in Minnesota were similarly caught up. There appear to have been many people in those days looking only to exploit the chaos and disorder in the interests of personal gain or random violence. There appear also to have been many people who felt angry, frustrated, and disenfranchised, and who were attempting, in many cases in an unacceptably reckless and dangerous manner, to give voice to those feelings. Mr. Lee appears to be squarely in this latter category. And even the great American advocate for non-violence and social justice, Dr. Martin Luther

King, Jr., stated in an interview with CBC's Mike Wallace in 1966 that "we've got to see that a riot is the language of the unheard." Lily Rothman, *What Martin Luther King Jr Really Thought About Riots*, Time Magazine (2015), *https://time.com/3838515*.

In light of these circumstances, the analysis of the Guidelines does not appear appropriate. Consider, for example, that both assault with intent to commit murder and attempted murder have a base offense level of 33. U.S.S.G. § 2A2.1(a). This means that, if Mr. Lee had assaulted Mr. Stewart with the intent to kill him, his Guideline range would be 135–168 months' imprisonment—about ten years less than the current range. But the criminal culpability, and the danger to society, that an attempted murderer poses appears much greater than the culpability and danger of Mr. Lee.

c.      *Comparable Sentences*.

This case can be compared and contrasted with other cases the United States found in which arson or the detonation of a destructive device took a human life.

- In *United States v. Martinez*, the defendants detonated a bomb to destroy a commercial building as part of a protection money scheme. 16 F.3d 202, 204 (7th Cir. 1994). The bomb killed a co-conspirator. *Id.* The defendants received sentences ranging between three and ten years, depending upon roles in the offense and criminal histories. *Id.* at 205.

- In *United States v. Paden*, the defendant was convicted of setting an electrical fire in a commercial building to commit insurance fraud. 908 F.2d 1229, 1232–33 (5th Cir. 1990). A firefighter responding to the fire was trapped by falling debris and killed. *Id.* at 1233. The defendant was sentenced to 140 months' imprisonment. *Id.*

- In *United States v. Martin*, the defendant destroyed a two-story residential apartment building in retaliation for an occupant's having informed on his drug dealing activities. 63 F.3d 1422, 1424 (7th Cir. 1995). Three firefighters were trapped when a wall collapsed, and two died. *Id.* The defendant was sentenced to 50 years' imprisonment. *Id.*

- In *United States v. El-Zoubi*, the defendant paid his 20-year-old nephew to burn his store down to collect insurance money. 993 F.2d 442, 445 (5th Cir. 1993). The nephew was killed in the fire. *Id.* The defendant was sentenced to 120 months' imprisonment. *Id.*.

How does the Defendant's conduct compare with that of the defendants in these cases? The analysis is complicated. Unlike the cases of *Martinez* and *El-Zoubi*, Mr. Stewart was not a co-conspirator to the crime—he neither contributed to the danger nor assumed the risk of the crime. He was unlawfully in the pawn shop, but he did nothing to hurt or endanger anyone. Unlike *Martin*, Mr. Lee burned down a commercial building, not a residential one. And unlike all the cases above, however (particularly *Martin*), Mr. Lee did not commit the offense as part of a separate felony crime, or otherwise for any personal gain. The raised fist Mr. Lee showed, and his brazenness in committing the crime (*see* Fig. 2, *supra*) is telling. Mr. Lee was terribly misguided, and his actions had tragic, unthinkable consequences. But he appears to have believed that he was, in Dr. King's eloquent words, engaging in "the language of the unheard."

Also telling is Mr. Lee's candor to agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) after he was arrested. The interview took place on June 15, 2020, before the discovery of Mr. Stewart's body. But Mr. Lee took responsibility for his actions and admitted to having set the fire, to his credit. He explained the reasons he had done so, consistent with his statement of acceptance of responsibility (PSR ¶ 13).

d.      *The § 3553(a) Factors.*

The United States now turns to the sentencing objectives of federal law. The law specifically delineates four categories of requirements for a sentence. 18 U.S.C. §

3553(a)(2)(A)–(D).  Each is addressed separately below.

The Court's sentence must "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3533(a)(2)(B).  Specific deterrence does not appear to be a driving factor in this case.  Mr. Lee appears to be a thoughtful, intelligent man.  He does have a terrible incident of domestic violence in his criminal history, in which he viciously assaulted a woman and ruptured her left eardrum.  (PSR ¶ 33.)  However his non-vehicular criminal history ends in 2016, when he was 21 years old.  (*Id.*)  His longest sentence has been 60 days' jail, for the domestic assault.  (*Id.*)  And his criminal actions as a younger man appear informed by the abusive and unstable environment in which he grew up, for which he has sought treatment.  (PSR ¶¶ 44–47, 64.)   A long sentence does not appear necessary to deter Mr. Lee from future crime.  General deterrence likewise seems to be of limited import here.  The events of late May of 2020 were informed by forces that have been present in this country since its inception.  General deterrence appears to be of limited relevance given the passions and historical forces at work in the crime.

The Court's sentence must also "protect the public from further crimes of the defendant."  18 U.S.C. § 3533(a)(2)(C).  This factor too appears to be of limited relevance.  For the reasons noted in the discussion about deterrence above, Mr. Lee does not appear to pose a danger to the public.

The Court's sentence must "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."   18 U.S.C. § 3533(a)(2)(D).  Here again, this does not appear to be a factor that would drive the Court's sentence.  Mr. Lee reports no illegal drug use since 2019, and has completed substance

10

dependency treatment.  (PSR ¶¶ 61–62.)  He states that he obtained his GED.  (PSR ¶ 64.)

He has had significant troubles in school, but this trouble, as well as his history of drug

abuse, again appears to be the result of the abusive and unstable environment in which he

grew up.  (PSR ¶¶ 44–47, 64.)  Mr. Lee had a plan to turn his life around, which appears

to have been upended by the COVID-19 pandemic.  (PSR ¶ 48.)  Though he would no

doubt benefit from prison programming, a lengthy sentence does not appear necessary to

provide training, care, or treatment.[1]

That leaves the first requirement that the law imposes: the need for the Court's

sentence "to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  In the view of the

United States, this is the factor that must drive the Court's sentence.  The Court's sentence

must account for the fact that Mr. Lee's crime took Oscar Stewart's life.  It is for this reason

that the United States requests a sentence of 144 months' imprisonment.

In the *Martinez* case, Seventh Circuit Chief Judge Richard Posner discussed the

difficulty in sentencing someone whose reckless actions had taken a human life.  16 F.3d

at 205–06.  He discussed "the difference in culpability between endangerment and death,"

and described what philosophers call "moral luck":

> It is true that in a system of morality in which only intentions and behaviors,
> but not consequences, count, there is no moral distinction between dangerous
> conduct that causes harm and otherwise identical dangerous conduct that
> does not.  The only difference is luck, not usually considered a moral
> attribute.  But "moral luck," as philosophers refer to distinctions in

---

[1] The United States likewise acknowledges that, as the Supreme Court has noted, sentencing courts may not impose a prison term to promote an offender's treatment or rehabilitation.  *Tapia v. United States*, 564 U.S. 319, 326–27 (2011).

culpability that are based on consequences rather than intentions, is, rightly or wrongly, a pervasive characteristic of moral thought in our society, at least the moral thought that informs the criminal law. Two people drive at the same unlawful speed under identical road conditions. One hits a child; one hits no one. The first is guilty of involuntary manslaughter; the second of a violation of the highway code. The only difference between their conduct is the consequence. The difference, though fortuitous, counts for the severity of the punishment deemed appropriate for the defendants' behavior.

*Id.*

Judge Posner's analysis applies no less in this case. "Moral luck" casts a long shadow over this case. Had circumstances been just a little different, Mr. Stewart would be alive today, and Mr. Lee would face significantly less criminal liability (a Guideline range of 60 months, approximately 15 years less than the PSR's calculation)—the cruel caprices of fate. But consequences matter. As in *Martinez*, Mr. Lee must face responsibility for the consequences of his actions, not just his intent.

No term of imprisonment will bring Mr. Stewart back, or adequately reflect the loss of his life. A sentence of 144 months will reflect the seriousness of Mr. Lee's offense, promote respect for the law, and provide just punishment for that offense. It is 73 times more than the longest sentence Mr. Lee has ever previously served (60 days). It is sufficient to address the sentencing factors of 18 U.S.C. § 3553(a).

### III.    CONCLUSION

In light of all the facts of the facts in this case, and pursuant to the sentencing objectives of 18 U.S.C. § 3553(a), the United States asks this Court to sentence the Defendant to a term of imprisonment of 144 months.

Date:  November 4, 2021

Respectfully Submitted,

W. ANDERS FOLK
Acting United States Attorney


*s/ Thomas Calhoun-Lopez*

BY:  THOMAS CALHOUN-LOPEZ
Assistant U.S. Attorney
Attorney ID No. 480908DC