UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| UNITED STATES OF AMERICA, | ) | Criminal No. 20-CR-168 (WMW-ECW) |
|---|---|---|
| v.    Plaintiff, | ) ) ) | |
| MONTEZ TERRIEL LEE JR., | ) ) ) | **DEFENDANT'S SENTENCING POSITION** |
| Defendant. | ) | |

## INTRODUCTION

The dawn of the past decade brought forth an atmosphere which drastically altered the state of our societal condition. It was the year 2020; a year that began with nation-wide fear of a deadly pandemic, a year that began with domestic divisiveness derived from political tribalism. As tensions continued to rise among citizens, one tragedy on the 25th of May became the precipice for one of the largest political movements in our nation's history. Eight minutes and forty-six seconds. The video that shocked the world.

The phenomena of police brutality towards African Americans was one that the public conscious was well aware of by this time. The first public glimpse was in 1992 with Rodney King. The acquittal of all four officers set forth a public precedent that even when documented on video, the police were immune to any culpability while abusing the power granted to them by the government. Throughout the 2010's, instances of police killings started to gain widespread public attention. From Michael Brown, Tamir Rice, Freddie Gray, Sandra Bland, Philando Castile, Eric Garner, Breonna Taylor and many

1

others. A common occurrence within black households was "the talk," where parents would teach their children that they will not be treated the same by police and to use as much caution as possible if encountering the police. As the decade progressed, mass media and political movements increased throughout the country.

With the past decade setting the stage for high tensions and an oppositional relationship between police officers and black men, the murder of George Floyd exponentially enhanced that tumultuous dynamic. The video seen around the world created a type of chaos sparsely witnessed in the history of this country. And it was amidst this chaotic climate that resulted in the instant offense.

It was May 28th of 2020. The protests following the death of George Floyd were in full swing, and it was on this day that the National Guard was activated to counter the protests and riots. The smell of tear gas and smoke were present throughout the intersection of Minnehaha Avenue and Lake Street. Even in midday, the intersection was filled with thousands. Sound grenades were frequently utilized to combat the crowds' actions. Military-grade Humvees were present throughout the city. Blackhawk helicopters could be seen circling the area. The true state of the environment is difficult to accurately describe in words other than being tantamount to a Hobbesian state; entirely devoid of the social contracts we have had in place to retain the fabric of our society.

On the 28th of May, Montez Lee Jr. had just gotten released from jail. He had been in jail throughout the release of the 8:46 video and the beginning of the protests. Mr. Lee

recalled feeling enraged after all of these years of extrajudicial murders and felt compelled to go to the central area of the chaos. Initially, Mr. Lee had no intentions of participating in the rioting. He and his friends planned to shoot footage for a documentary. As Mr. Lee became acclimated to this chaotic environment, his lifelong pent-up animosity and fear towards police officers in combination with the intoxicating effects of the seemingly lawless area pushed him to let some of his frustrations out. It began with breaking windows, but eventually led to making the biggest mistake of his life. A gas can was already sitting inside Max It Pawn on Lake Street. Before pouring the gasoline, Mr. Lee called out to make sure there were no people left inside the store. Later, it was discovered that there was in fact a person inside even though Mr. Lee was certain no one would fall victim to the burning building.

On August 12, 2020, a one-count indictment charged Mr. Montez Lee Jr. with Arson on Property Used in Interstate Commerce pursuant to 18 USC § 844(i). On July 22, 2021, Mr. Lee pled guilty to the indictment as charged. Mr. Lee understands that the death resulting from the instant offense triggers the enhancement outlined in USSG § 2K1.4(a)(1) pursuant to USSG 2K1.4(C)(1).

## BACKGROUND

Montez Terrial Lee Jr. was originally born in Germany to a father who was in the army. At the age of five Mr. Lee's biological mother, Mrs. Chanda Rosser, left the

family. Mr. Lee has asserted that although he lacked a concrete understanding behind why Mrs. Rosser abandoned the family, he thought it was likely due to domestic abuse from his father. He has not had any contact with any member of his maternal side of the family since.

Mr. Lee's early upbringing was tumultuous at best. Mr. Lee spent his early years in East Saint Paul, where he recalled frequent physical and sexual abuse from his father. He asserted that his father was affiliated with the street gang "Gangster Disciples" (also referred to as "GD's") which led Mr. Lee to identify as a GD as early as elementary school. A woman by the name of Elizabeth Tobako served a motherly role in Mr. Lee's life in lieu of his biological mother. On one instance particularly pertinent to the present matter, Mr. Lee described walking with his father at a young age to a gas station when police officers drew their guns at the two of them. Police had mistakenly identified them as suspects in a crime. Mr. Lee's Father decided to move the family to Rochester, Minnesota with the hopes that it would provide a safer environment for his kids.

Mr. Lee initially succeeded in academia, but his father's expectations were so high, and met with such harsh consequences, that he decided to give up due to discouragement. On one instance, Mr. Lee participated in a spelling bee where he placed second. His father responded by physically abusing Mr. Lee because he did not place first. The frequent household abuse endured by Mr. Lee was documented on multiple occasions by interventions of Child and Family services and eventually resulting in a

domestic assault conviction. One of the instances cited described Mr. Lee's father striking Mr. Lee's younger brother (Justin) over 20 times with a belt, and additionally, threatening Mr. Lee with a knife. Even after the interventions from Protective services, Mr. Lee was not removed from the home.

With the constant sexual and physical abuse perpetrated on Mr. Lee by his father, he decided to leave the house at the age of 15 years old. Earlier that year, (Mr. Lee's freshman year in high school) he confronted his father regarding the state of his mental health and possibly seeking some form of remedial treatment. His father responded by stating "that's that white people shit" (referring to mental illness and treatments such as therapy). Mr. Lee's home life was filled with so much pain caused by the hands of an abusive and tyrannical father, that the prospect of leaving and living on his own at the age of 15 would award him a better life than living at home with his father despite not having a concrete place to reside.

Throughout his later adolescence, Mr. Lee moved around from place to place; accepting any offer another would allow. Due to a life-long precedent of abuse from those who were typically supposed to provide protection, Mr. Lee found it exceedingly hard to completely trust anyone. He had initially tried alcohol at the early age of 10, but as the years progressed, so did his experimentation of substances. For a brief period, Mr. Lee was selling drugs to get by while he remained largely homeless.

Mr. Lee has two children. Aliyah Lee was born on January 7, 2014 (age 7), to a woman by the name of Kaylin Polk. Aliyah Lee was conceived through a causal relationship between the Mr. Lee and Ms. Polk. Mr. Lee has had no contact with his daughter Aliyah since 2016 and has been paying child support for her.

Mr. Lee's second child is Nikko Lee who was born on November 3, 2017 (age 4) to a woman by the name of Megan Underhill whom the Defendant dated for around 5 years. The relationship ended as it grew more and more toxic[1]. Ms. Underhill has retained full custody over their child. Mr. Lee has made multiple attempts to see and take care of his Four-year-old child Nikko.

Mr. Lee recalled his five-year relationship with Ms. Underhill as being filled with frequent arguing and multiple instances of infidelity from Ms. Underhill. Mr. Lee recalled that these arguments escalated to the point where Ms. Underhill would physically abuse him. This toxic dynamic between the couple caused the two to end their relationship in 2018; just a year after their baby was born. These instances continued to the point where, one day, Mr. Lee responded back to the physical abuse which resulted in charge and conviction for Mr. Lee.

Mr. Lee has retained a relationship with Ms. Kylee Harrison for the past two and a half years. Ms. Harrison is employed in the intensive care unit at the Mayo Clinic in Rochester, Minnesota. Ms. Harrison also attends nursing school with the goal of becoming a registered nurse. She stated that she had no concern over Mr. Lee's current

---

[1] Instances of Domestic Abuse and infidelity.      8888

mental health, substance abuse issues, or gambling issues. Additionally, she stated that Mr. Lee is a good father to both his own children and her two children. Ms. Harrison stated that there have been no issues relating to domestic abuse from Mr. Lee. She stated that she is committed to assuming the role of a support system for Mr. Lee, and that, when released, he is welcome to return to her residence; providing a place to live in an enviroment of oversight and accountability.

Throughout the years, Mr. Lee work at a myriad of jobs. His last place of employment was at Virgil's Towing Company located in Rochester, Minnesota form January, 2020 through April of 2020. Mr. Lee's probation violation from May, 2020, was the cause for his termination. While Mr. Lee was simultaneously working more ordinary jobs, he was also dedicating a substantial about of time into his music career.

Mr. Lee finally found his vocational calling in music. He found a social surrounding that was conducive to his ability to create music and began to excel in this atmosphere. He started to get booked and performed in front of audiences at places such as the Red Sea in Minneapolis. Mr. Lee's music career had started to accelerate and appear promising due to the number of already booked shows filling up his schedule. His success as a musician was drastically impeded by the COVID-19 pandemic which led to those shows getting canceled.

Mr. Lee goes by the stage name "Prod The Mastermind" and has released multiple collections of music on the internet including an EP that was released in January of 2020.

The themes reflected by the lyrics in Mr. Lee's music are closely tied to the hardships he endured. Recognition of his own wrong doings in the past, living with demons from a hard childhood, and asking for forgiveness from the lord as he prays are common themes in his music. In his music he often mentions his daughter and his dedication to her.

For example, he reflects on his early hardships and the way he dealt with it on a song titled "Life in Ashes" where the lyrics state:

> I came from the bottom
>
> I swallowed my pain through the bottle
>
> A problem

In his song titled "Prod's Revenge" the lyrics state:

> Pain cut deep like surgical
>
> Drugs for the healing
>
> Pray to the Lord for forgiveness
>
> Hope he willing to face the consequences
>
> For a life of sinning

And:

> I hear the words from the wise
>
> They predicted the fall for my demise
>
> I pray to the Lord cause my soul was denied
>
> The man in the mirror I don't recognize

Another common theme among Mr. Lee's music is the motivation for the desire to give his daughter a better life. In his song entitled "On Me Freestyle" he writes:

Lifestyle I thrive for

Work hard and grind for

To give my daughter everything she ask for

No worries baby

The medium of music has created a multifaceted vocation for Mr. Lee to be productive while simultaneously serving as a therapeutic outlet for his mental health struggles and trauma from his upbringing.

A common theme throughout Mr. Lee's life is that aspect of trust. At a young age, the figures who traditionally assume the role of protection and comfort were instead sexually and physically abusive towards him, leading to mistrust in his household. So much mistrust that he decided to be homeless at the age of 15 instead of having a guaranteed place to live. Mr. Lee continued to experience a similar form of mistrust with the mother of his second child Megan Underhill; living in an abusive and toxic relationship filled with infidelity and arguments. Mr. Lee also developed mistrust towards the police officers from an early age by being falsely identified resulting in officers drawing guns on him and his father. The last additional factor that has greatly contributed to Mr. Lee's mistrust of officers and the government have been the increasingly public instances of police brutality and extrajudicial killings throughout past decade. As a Black

man in a America who has witnessed first-hand the phenomena of egregious acts committed by police towards black Americans with decades long precedent of complete immunity.

## ANALYSIS

Although the Sentencing Guidelines have been advisory for well over a decade now, *United States v. Booker*, 543 U.S. 220, 259-60 (2005), they continue to play a limited role in this Court's sentencing analysis as one of many factors for consideration under 18 U.S.C. § 3553(a). As such, a sentencing analysis must begin with an accurately calculated Guidelines range, then consideration of that range in combination with the remaining statutory factors to fashion a sentence sufficient, but not greater than necessary, to honor § 3553(a)'s principles.

While the Court must determine a defendant's Guidelines range, the Supreme Court has underscored the limited role the Guidelines ought to play in the ultimate sentence. They carry no presumption of reasonableness for a sentencing court. *Nelson v. United States*, 555 U.S. 350, 351 (2009) (per curiam). Sentencing courts may vary from the Guidelines based on considerations as provocative as simply disagreeing with the Guidelines' treatment of an offense, *see, e.g., Kimbrough v. United States*, 552 U.S. 85, 110-11 (2007), or for purely policy reasons, *see Rita v. United States*, 551 U.S. 338, 357 (2007). Variances from the Guidelines do not need to be accompanied by "extraordinary" circumstances, and can be based on factors within or outside the Guidelines themselves.

*Gall v. United States*, 552 U.S. 38, 47 (2007). The essential sentencing touchstone is not the Guidelines, but rather 18 U.S.C. § 3553(a), which directs a court to impose a sentence "not greater than necessary" to honor the factors enumerated in that section. *See, e.g., United States v. Huff*, 514 F.3d 818, 820 (8th Cir. 2008) ("[A] district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)." (citation omitted)). This is an inherently individualized and restrictive inquiry, since the primary enumerated goal of § 3553(a) is sentencing moderation. *Gall*, 552 U.S. 49-50.

In the following section, Mr. Lee outlines why a downward variance from the Sentencing Guidelines would be an appropriate sentence which would serve as a just punishment under 18 U.S.C. § 3553(a), an assertion that the State has already agreed to in their position pleading.

18 U.S.C. §3553 Outlines the following factors for the court to determine a sufficient but not greater than necessary sentence which are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational

> training, medical care, or other correctional treatment in the most effective manner;

(2) the kinds of sentences available;

(3) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(4) any pertinent policy statement . . . issued by the Sentencing Commission;

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

**(1) The Circumstances of the Offense**

On August 12, 2020, a one-count indictment charged Mr. Montez Lee Jr. with Arson on Property Used in Interstate Commerce pursuant to 18 USC § 844(i). On July 22, 2021, Mr. Lee pled guilty to the indictment as charged. Mr. Lee understands that although the death that resulted from the instant offense was not only unintentional and without his knowledge, nevertheless triggers the enhancement outlined in USSG § 2K1.4(a)(1) pursuant to USSG 2K1.4(C)(1).

On May 28, 2020, Mr. Montez Lee Jr. drove with a group of friends to south Minneapolis to witness and document the protests occurring over the murder of George Floyd at the hands of officer Derek Chauvin. He was just released from jail after a

probation violation. The city was in a chaotic state the likes of which this country rarely experiences. This environment was the result of months long lock-down due to the COVID-19 pandemic accompanied by a nation-wide outrage over the release of one of the least justified extrajudicial murders that the nation had seen on video.

The original plan among the group was to film a documentary which is evidenced by the varying video qualities. Some of the videos contained in discovery derived from a snapchat video, while others appear much higher quality; similar to a modern DSLR camera. The absence of any attempt by officers to apprehend the thousands breaking the law created an environment which was so lawless, so intoxicating, it gave many who were there a feeling of immunity and encouragement to participate in the chaos.

Mr. Lee's group began with breaking a couple of windows of buildings which had already started to deteriorate. As the climate became more and more chaotic, every store in the area was in the process of being looted. At this time, any public safety measures were entirely absent. The mob mentality felt across the totality of the attendees in the area amped up to a point where an unfinished six story apartment building was turned into ashes. Smoke was everywhere.

As Mr. Lee entered MaxIt Pawn Shop on Lake Street with his group of friends they can be seen talking about the police brutality and how to get the attention of decision makers. The video also depicts the desolate state of the store and showed that looters already had taken everything, leaving behind only an empty store. Before Mr. Lee

decided to ignite the accelerant in the store, he called out to ensure that no one was in the building. Another aspect to consider when analyzing the offense committed by Mr. Lee was the race of decedent. Mr. Lee was there protesting police and supporting Black Lives Movement. He certainly would not have wanted to harm a brother in arms.

**(2) Mr. Lee's History and Characteristics**

Mr. Lee's extraordinary hardships at an early age left him mistrustful of the world. Early on in his childhood he suffered physical and sexual abuse at the hands of his father. The absence of a biological mother deprived Mr. Lee of the typical parent-child bond which instills a feeling of protection and love. Instead, Mr. Lee had to protect himself from those who were typically supposed to protect him. After the decision to live alone at the young age of 15, he encountered continued adversity while attempting to find shelter and resources as a minor. Remaining largely homeless throughout the latter years of his adolescence, Mr. Lee was apprehensive to fully entrust people he encountered due to the precedent of his early home-life.

As outlined in the PSR and the Government's Position Pleading, Mr. Lee has had several prior convictions. The most egregious of which is a domestic assault conviction from 2016 when the defendant was 21 years old. (PSR 33). While complete justification for the offense is absent, an understanding behind Mr. Lee's offense can be contextualized by the myriad of early exposure to domestic abuse within his household. Subsequent to the 2016 domestic assault and violations of NCO's, Mr. Lee's criminal

14

history consisted of only petty misdemeanor and misdemeanor vehicular offenses. The absence of violent offenses before and throughout the following four years of the 2016 offense indicate that recidivism of the kind remains unlikely.

Mr. Lee is an intelligent, idealistic man with a vision for his own future. When he first started to improve his life and dedicate his time to a career as a musical artist, the world shut down. Mr. Lee remains optimistic that once this matter is resolved and his liberty is restored, he will start an LLC and continue to pursue a career in music. After obtaining a GED in 2016, Mr. Lee enrolled in Rochester Community Technical College for a single semester and enrolled in University of Phoenix online for a semester. (PSR 64). While he did not complete any of the credits at either institution, Mr. Lee asserted that he utilized his time by learning about music production and was able to access the equipment at the college which allowed him to gain the knowledge he needed to pursue his music career.

**(3) Sentencing Guidelines and Appropriate Sentences**

Mr. Lee does not dispute the calculation of the total offense level outlined by the PSR and the Government's Position Pleading. The total offense level of 35 in addition to a criminal history category of 3 grossly overrepresent the severity of the offense when compared to cases with analogous computations. The Government agrees to this assertion in its Position Pleading, stating "that both assault with intent to commit murder and attempted murder have a base level offense of 33, . . . [meaning] that if Mr. Lee had

assaulted Mr. Stewart with the intent to kill him . . . his guideline range would be . . . about ten years less than the current range." (Gov. Position Pleading at 8.)The Government adds that "the criminal culpability, and the danger to society, that an attempted murderer poses appears much greater than the culpability and danger of Mr. Lee." (*Id.*) The Government also asserts that a lengthy sentence would not serve a role of deterrence for future crimes of the defendant. (*Id.* at 10.)

The factors for consideration of a just sentence under 18 U.S.C. 3553(a)(2) when applied to the instant offense warrant a downward variance outside of the Sentencing Guidelines. First, as the Government asserted, a lengthy sentence would not serve a role of deterrence for future crimes of the defendant under 18 U.S.C. 3553(a)(2)(B). (*Id.* at 10.) This is due to the fact that offense occurred in such an anomaly of an environment (the George Floyd Riots) and because the defendant lacks the criminal history which would illustrate a propensity to engage in this type of conduct in the future.

Second, under 18 U.S.C. 3553(a)(2)(C) which outlines that the sentence must protect the public from futures crimes follows the same reasoning as the aforementioned factor. Because the offense occurred amidst a chaotic, animosity fueled, environment never-before seen by Mr. Lee's generation, it is highly unlikely that Mr. Lee would continue to pose a threat to the public outside of this extremely isolated incident.

Third, under 18 U.S.C. 3553(a)(2)(D), Mr. Lee had already begun to take measures to remedy his issues with substance dependency by completing treatment. He attained a

GED and had shown efforts to further a law-abiding life with his music career. A lengthy sentence in accordance with his current Guideline calculations here would not serve the purpose the statute intends to promote.

Last to consider is the first factor under 18 U.S.C. 3553(a)(2)(A), to "reflect the seriousness of the offense, promote respect for the law, and to provide justice for the offense." The Defendant understands that the severity of the death of Oscar Stewart which resulted from the Arson is not a something that can be disregarded when considering an appropriate sentence. However, the instant offense was perpetrated in manner so dissimilar to analogous cases, a substantial departure from the guidelines would be appropriate. With an advisory Guideline range of 210-240 months, as the Government also contends, the Defendant's range is 15 years longer than it would in the absence of Mr. Stewart's death.

Mr. Lee was present to protest injustices committed by agents of the government on to people who looked like him; black males in the United States. There was no substantial duration of premeditation or pre-planning, not only of the death enhancement, but also the principal count of arson under 18 U.S.C. 844(i). Mr. Lee did not bring accelerants to the protests. Even in a state of heightened animosity within an apocalyptic-type environment, he called out to check if anyone was still inside the building before igniting the accelerant. Mr. Oscar Stewart was a fellow black male, the same kind of person that Mr. Lee was protesting on the behalf of. The Mens Rea of Mr. Lee while

committing the instant offense was severely atypical to the orthodox arson resulting in death.

For the aforementioned reasons, the Defendant seeks a sentence of 88 months imprisonment. A sentence of this length would reflect the seriousness of the offense, but would also allow Mr. Lee to have an additional chance at life; to be a father, to provide for his community, and to become a law-abiding citizen once again.

## CONCLUSION

In consideration of the specific characteristics of this case, and the reasoning mentioned above, Mr. Lee respectfully requests this Court to impose a custodial sentence no greater than 88 months' imprisonment followed by 5 years of supervised release. Respectfully submitted,

RIVERS LAW FIRM, P.A.

Dated: 11-30-2021

By: /s/ Bruce Rivers
Bruce Rivers (#282698)
Attorney for Defendant
Rivers Law Firm, P.A.
701 Fourth Avenue South, Suite 300
Minneapolis, MN 55415
Telephone: (612) 339-3939
Facsimile: (612) 332-4003